UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MEGAN MIRZA,

       Plaintiff,

v.

PROVISION LIVING, LLC, and
RHONDA HENDRICKSON,

       Defendants.
_____/

Case No. 21-10266

Hon. Nancy G. Edmunds

### OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [25]

Plaintiff Megan Mirza initiated this lawsuit against her former employer, Provision Living, LLC, ("Defendant") and former co-worker, Rhonda Hendrickson, in the Oakland County Circuit Court, but the matter was removed to this Court based on diversity jurisdiction.[1] (ECF No. 1.) Plaintiff brings claims under Michigan's Worker's Disability Compensation Act ("WDCA") and Persons with Disabilities Civil Rights Act ("PWDCRA") as well as for intentional infliction of emotional distress. The matter is before the Court on Defendants' motion for summary judgment. (ECF No. 25.) Plaintiff opposes the motion. (ECF No. 27.) Defendants have filed a reply. (ECF No. 28.) Pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), Defendants' motion will be decided on the briefs and without oral argument. For the reasons below, the Court DENIES IN PART and GRANTS IN PART Defendants' motion for summary judgment.

---

[1] Plaintiff later moved to remand this case to state court, but the Court denied that motion. (ECF No. 16.)

1

**I.	Background**

Plaintiff was hired on November 20, 2018, as the Executive Director at Defendant's assisted living community in West Bloomfield. The community had not yet opened and was in the last stages of construction at the time. The Executive Director's role prior to opening was to serve as "the lead marketer and/or sales development individual, along with the director of sales." (ECF No. 25-4, PageID.306.) As the community came closer to opening, the Executive Director became responsible for "hiring all managers, all employees, making sure paperwork is done correctly, making sure all policies and procedures are in place, and making sure that the business and the community is ready to open." (*Id.*) Shortly before the grand opening, the Executive Director also became responsible for conducting an all-staff orientation, lasting approximately three to five days. Orientation at the West Bloomfield community was held on February 11-15, 2019. (ECF No. 25-2, PageID.261.) At the time, Defendant Hendrickson was an Operations Support Specialist. (ECF No. 25-5, PageID.345.) In this role, she provided operational support to a number of Defendant's senior living communities. She did not have any supervisory authority over the Executive Directors. Both she and the Executive Directors reported to Defendant's then-Senior Vice President, Andrew Kennard.

Defendants aver that Plaintiff exhibited performance issues immediately after being hired, including repeatedly missing deadlines, requiring follow-up, and showing a lack of professional judgment. (*See, e.g.*, ECF No. 25-4, PageID.325; ECF No. 25-5, PageID.361; ECF No. 25-15.) A decision to discharge Plaintiff was made and a severance agreement was prepared on February 6, 2019, with a tentative termination date of February 8, 2019. (ECF No. 25-40.) That agreement was not executed. Mr. Kennard

2

testified that he delayed the discharge because orientation would not be the appropriate time to terminate the Executive Director. (ECF No. 25-4, PageID.335.)

The week after orientation, on February 20, 2019, Plaintiff slipped on the ice in the parking lot as she was leaving work and fell backwards. (ECF No. 25-2, PageID.268.) Ms. Cheri Cordell, the director of sales, was with her and helped her get to her car. Plaintiff later called the owner and asked him to have the construction company salt the lot.

The next morning, on February 21, 2019, Ms. Cordell emailed Mr. Kennard and Ms. Hendrickson asking for someone to salt the lot and informing them of the fall. (ECF No. 25-42.) That same morning, Ms. Hendrickson called Plaintiff and asked her to come to her office so she could file a worker's compensation claim. (ECF No. 25-2, PageID.269.) As Plaintiff was walking into work, she again slipped on the ice and fell. Plaintiff was helped up and made her way into the building. Later that morning, Plaintiff met with Ms. Hendrickson, who Plaintiff testified was upset and hostile towards her. (*Id.* at PageID.271.) She also testified that Ms. Hendrickson was concerned Plaintiff would be put on light duty, refused to allow her to go home and change her wet clothes, and slammed her hand on the desk and said that Plaintiff was going to sit right there and file two incident reports and "I'm going to sit right here until you do it." (*Id.*) According to Plaintiff, Ms. Hendrickson then closed the door and sat across from her while she called in the two reports. Plaintiff declined going to the hospital because she felt intimidated, nervous, and uncomfortable. (*Id.*) She also minimized her injuries and tried reassuring Ms. Hendrickson that she would not go to the hospital or need to be placed on light duty.

According to Mr. Kennard, Ms. Cordell, who witnessed both falls, indicated that Plaintiff appeared to intentionally walk over the same icy spot prior to her second fall.

3

(ECF No. 25-4, PageID.327.) He also testified that he decided to further delay terminating Plaintiff so that she could go through the worker's compensation process. (*Id.* at PageID.333.)

In early March, Mr. Kennard informed Plaintiff that Defendant was hiring Lisa Battersby to serve as its customer relationship manager. (ECF No. 25-2, PageID.254.) She had accepted the offer but had asked that no one contact her then-current employer. Plaintiff, however, called one of Ms. Battersby's colleagues. Plaintiff testified that she had not been made aware that Ms. Battersby did not want her current employer contacted. (*Id.* at PageID.255.) Defendants aver that this incident shows a lack of judgment. Mr. Kennard emailed Mr. Sterling Price, the director of human resources, about the incident, and Mr. Price suggested moving forward with the decision to terminate Plaintiff. (ECF No. 25-44.) An updated severance agreement was prepared on March 11, 2019, with a termination date of March 12, 2019. (ECF No. 25-45.)

On March 12, 2019, Plaintiff's doctor placed Plaintiff on work restrictions until March 27, 2019. (ECF No. 25-46.) Plaintiff gave Defendants the doctor's note that day. The next day, Mr. Kennard forwarded the note to Mr. Price, indicating in his email that they had not received any documentation from Plaintiff regarding visits to her doctor prior to that time and the "need to have a conversation first thing on next course of action." (ECF No. 25-47.) The updated severance agreement was not executed. Plaintiff testified she later provided a different note changing her return date to March 15, 2019, because she found Mr. Kennard and Ms. Hendrickson "hostile" and "aggressive" and she was worried she would lose her job. (ECF No. 25-2, PageID.274.) Ms. Shon Hall, who was in human resources, had initially indicated that Plaintiff would be placed on a light duty plan

4

upon her return. But she later informed Plaintiff that Defendants did not want her to return to work until she had seen all of her specialists. (*Id.* at PageID.275.) She also told her to call Mr. Kennard and Ms. Hendrickson. Plaintiff testified that Ms. Hendrickson told her she did not have time for her call and hung up and Mr. Kennard "yelled at her" when he returned her call. (*Id.* at PageID.276.) On March 25, 2019, Plaintiff's doctor extended her return date to April 16, 2019. (ECF No. 27-29.)

In April, text messages revealed that Plaintiff requested a medication from a fellow employee. (ECF No. 25-48.) No medication was actually provided but Defendants point to this as another incident during which Plaintiff exhibited a lack of judgment. On April 11, 2019, Defendants terminated Plaintiff's employment. Plaintiff had not yet returned to work from her medical leave of absence. Mr. Kennard testified that he made the decision to terminate Plaintiff's employment, but Ms. Hendrickson had provided input as well. (ECF No. 25-4, PageID.333.) According to Plaintiff, her termination was relayed to her during a meeting with Mr. Kennard and Defendant Hendrickson in a coffee shop. Mr. Kennard told her that "based on everything that's happened to you, we think it would be best that we part ways" and gave her a folder with the severance agreement. (ECF No. 25-2, PageID.264.) Both Mr. Kennard and Ms. Hendrickson then got up and left. Plaintiff testified that she was still in shock when Mr. Kennard called her cell phone. She looked up and saw that he was still at the shop sitting at the bar and looking at her. He told her to coordinate with Ms. Hendrickson to retrieve her personal items from the building.

Plaintiff alleges discrimination and retaliation under the WDCA, disability discrimination under the PWDCRA, and intentional infliction of emotional distress. Defendants move for summary judgment as to all claims.

5

## II. Legal Standard

Summary judgment under Federal Rule of Civil Procedure 56(a) is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When reviewing the record, "'the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.'" *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (quoting *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). Furthermore, the "'substantive law will identify which facts are material,' and 'summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 327 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the initial burden "of establishing the 'absence of evidence to support the nonmoving party's case.'" *Spurlock v. Whitley*, 79 F. App'x 837, 839 (6th Cir. 2003) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "Once the moving party has met its burden, the nonmoving party 'must present affirmative evidence on critical issues sufficient to allow a jury to return a verdict in its favor.'" *Id.* at 839 (quoting *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 403 (6th Cir. 1992)).

## III. Analysis

### A. Retaliation

Under the WDCA, it is unlawful for an employer to "discharge an employee or in any manner discriminate against an employee because the employee filed a complaint

6

or instituted or caused to be instituted a proceeding under this act . . . ." [2] *See* Mich. Comp. Laws § 418.301(13). Retaliation claims brought under the WDCA are analyzed under different frameworks depending on whether the plaintiff relies on direct or indirect evidence of retaliation. *See Cuddington v. United Health Servs.*, 826 N.W.2d 519, 525 (Mich. Ct. App. 2012). When there is no direct evidence, the claims are analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Cuddington*, 826 N.W.2d at 525. The plaintiff must first establish a prima facie case of retaliation by showing that (1) she asserted a right to obtain necessary medical services or actually asserted that right, (2) the defendant knew she engaged in this protected conduct, (3) the defendant took an adverse employment action against her, and (4) there was a causal connection between the protected activity and the adverse employment action. *Id.* at 525-26. The burden of proof then shifts to the employer to articulate a legitimate, non-retaliatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802. Once the employer articulates such a reason, the burden of proof returns to the plaintiff to rebut the proffered reason by showing it was a pretext for retaliation. *Id.* at 804. A plaintiff may show pretext by demonstrating that the proffered reason 1) had no basis in fact, 2) did not actually motivate the adverse action, or 3) was insufficient to warrant the action. *Cuddington*, 826 N.W.2d at 526 (citation omitted). To show pretext, the plaintiff must demonstrate

---

[2] Plaintiff alleges both discrimination and retaliation under the WDCA in her complaint. Defendants note that based on the statutory language, claims for discrimination and retaliation in this context are the same. Plaintiff does not dispute this assertion. And to the extent Plaintiff alleges disability discrimination under the PWDCRA, that claim will be discussed below.

7

both that the proffered legitimate, non-retaliatory reason was false, and that unlawful retaliation was the real reason for the adverse act. *See White v. Telcom Credit Union*, 874 F. Supp. 2d 690, 707 (E.D. Mich. 2012).

Plaintiff insists that Mr. Kennard's comment regarding her termination being a result of "everything that's happened to you" constitutes direct evidence of retaliation. But "general, vague, or ambiguous comments" do not constitute direct evidence. *See Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir. 2008). Direct evidence is "'evidence which, if believed, requires the conclusion that unlawful [retaliation] was at least a motivating factor in the employer's actions.'" *Cuddington*, 826 N.W.2d at 525 (quoting *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520 (Mich. 2001)). In other words, it is evidence that "establishes without resort to an inference that an employer's decision to take an adverse employment action was at least in part retaliatory." *Id.* at 525. Here, Mr. Kennard's comment was vague and requires the factfinder to draw an inference to tie Plaintiff's termination to the filing of her worker's compensation claim in particular. Thus, it does not constitute direct evidence of unlawful WDCA retaliation.

Defendants argue that if the Court agrees that Plaintiff has not submitted direct evidence, they are entitled to summary judgment because Plaintiff has waived her claim under the *McDonnell Douglas* framework. While Plaintiff does not explicitly address the burden-shifting framework, she argues that the reason proffered by Defendants for her termination is pretextual. Thus, the Court does not find that she has waived her claim based on indirect evidence.

Defendants do not dispute the first three elements of Plaintiff's prima facie case of retaliation. But Defendants argue that Plaintiff cannot establish causation because

8

they made the decision to terminate her prior to the submission of her worker's compensation claim. While the Supreme Court has stated that an employer "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality," *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001), here, Defendants made an affirmative decision to delay the previously contemplated termination, *see Montell v. Diversified Clinical Servs.*, 757 F.3d 497, 507 (6th Cir. 2014) (distinguishing *Breeden* and noting that "if the adverse employment action . . . does not occur on the schedule previously laid out, then the temporal proximity of the adverse action to the protected conduct is certainly evidence of causation"). Mr. Kennard testified that the initial delay was due to the upcoming orientation, but Plaintiff was not terminated immediately after orientation. Instead, the week after orientation, she fell and submitted a worker's compensation claim and was terminated a few weeks later. Defendants state that additional performance issues arose during this time period, but the close temporal proximity between the protected conduct and Plaintiff's termination combined with the testimonial evidence, especially Mr. Kennard's comment regarding "everything that's happened to you," are sufficient to raise a genuine question of fact as to causation. Thus, the burden shifts to Defendants to provide a legitimate, non-retaliatory reason for Plaintiff's termination.

Defendants have articulated Plaintiff's performance issues as a legitimate reason for her termination. So, the burden of proof returns to Plaintiff to show that this reason was pretextual. Plaintiff disputes Defendants' characterization of her performance, but there is a basis in the record for those concerns. And the Sixth Circuit has noted that the courts "do not act as super personnel department, overseeing and second guessing

9

employers' business decisions." *See Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 611 (6th Cir. 2013) (stating that "[e]mployers are entitled to greater flexibility in management-level employment decisions") (internal quotations and citations omitted). The Court finds, however, a question of fact as to whether the performance issues actually motivated the adverse action. As discussed above, Defendants did not terminate Plaintiff even after the performance issues arose and a severance agreement was drafted. While there were additional issues later, Plaintiff fell and filed her worker's compensation claim during the same time period as well. Plaintiff testified that Mr. Kennard and Defendant Hendrickson were "hostile" and "aggressive" when addressing her claim and that Mr. Kennard stated, "based on everything that's happened to you, we think it would be best that we part ways." Thus, the Court finds a genuine question of fact as to pretext, and Plaintiff's WDCA retaliation claim survives Defendants' motion for summary judgment.

    **B.**    **Discrimination**

The PWDCRA prohibits an employer from discrimination on the basis of disability. *See* Mich. Comp. Laws § 37.1202(1). A plaintiff can show disability discrimination through direct evidence or by proceeding through the burden-shifting framework set forth in *McDonnell Douglas Corp.*, 411 U.S. at 802-04, which is described above. *Hazle*, 628 N.W.2d at 520. To establish a prima facie case of discrimination, Plaintiff must show (1) she is disabled as defined in the act, (2) her disability is unrelated to her ability to perform her job duties, and (3) she has been discriminated against in one of the ways delineated in the statute. *Peden v. City of Detroit*, 680 N.W.2d 857, 863 (Mich. 2004).

As in the context of her retaliation claim, Plaintiff has not presented direct evidence of disability discrimination and the Court will analyze her claim under the *McDonnell Douglas* burden-shifting framework. Defendants do not dispute that Plaintiff can establish a prima facie case of disability discrimination except to argue that the decision to terminate was made before she was injured. Because there is no dispute that Plaintiff is disabled under the act and she was terminated and then replaced by someone not disabled, the Court will assume she can show a prima facie case of discrimination. And for the same reasons discussed above, there is a question of fact as to whether the legitimate reason provided by Defendants for her termination—her performance—was a pretext for unlawful disability discrimination. Thus, Plaintiff's disability discrimination claim under the PWDCRA also survives Defendants' motion for summary judgment.

### C. Intentional Infliction of Emotional Distress

To establish a prima facie claim of intentional infliction of emotional distress, a "plaintiff must present evidence of (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Walsh v. Taylor*, 689 N.W.2d 506, 517 (Mich. Ct. App. 2004) (citation omitted). "Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* at 517 (internal quotations and citations omitted).

Plaintiff's claim for intentional infliction of emotional distress stems in large part from her meeting with Defendant Hendrickson following the second fall. She acknowledges that she declined medical treatment at the time but states that this was a

result of Ms. Hendrickson's intimidating behavior and refusal to allow her to leave until she filled out the paperwork for her worker's compensation claim. Plaintiff also highlights other behaviors leading up to her termination, such as Mr. Kennard "yelling at her," Defendants requesting additional documentation following submission of her doctor's note, and Mr. Kennard sitting at the bar and looking at her after telling her she was terminated and then calling to tell her to pick up her stuff. The Court does not find this behavior so outrageous or extreme to rise to the level of intentional infliction of emotional distress. *See, e.g.*, *Gibbs v. Voith Indus. Servs.*, 60 F. Supp. 3d 780, 802 (E.D. Mich. 2014) (noting that the standard for this tort has been described as "formidable" and finding the "cornering" of an employee while she was cleaning a restroom by a supervisor to sign some papers and then calling her a "bitch" when she refused to do so did not rise to that level) (internal quotations and citation omitted). Defendants are therefore entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is DENIED IN PART and GRANTED IN PART. More specifically, Plaintiff's discrimination and retaliation claims survive this motion, but her intentional infliction of emotional distress claim is dismissed with prejudice.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: March 14, 2023

12

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 14, 2023, by electronic and/or ordinary mail.

                                          s/Lisa Bartlett
                                          Case Manager